UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

WILFREDO PEREZ,

        Plaintiff,

  - against -

COMMUNICATIONS WORKERS OF
AMERICA LOCAL 1109, NYNEX/BELL
ATLANTIC/VERIZON

        Defendants.

-------------------------------------------------- x

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
03-CV-3740 (DGT)

TRAGER, District Judge:

     Plaintiff Wilfredo Perez ("Perez" or "plaintiff"), a former
employee of defendant NYNEX/Bell Atlantic/Verizon ("Verizon"),
brings this action against his former employer pursuant to Title
VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et</u> <u>seq</u>.
Perez alleges that he suffered discrimination in the form of:
(1) termination of his employment based on his race, color and
creed; (2) a hostile work environment and (3) retaliation for his
complaints of discrimination. In addition, plaintiff has brought
a similar discrimination claim against defendant Local 1109 ("the
Union"), the union to which he belonged during his employment at
Verizon. Plaintiff also claims that the Union failed to properly
represent and defend plaintiff during his employment although it
was aware of plaintiff's unequal treatment and harassment at
Verizon. Both defendants have moved for summary judgment

pursuant to Fed. R. Civ. P. 56.  For the reasons stated below,
defendants' motions are granted.

## Background

### (1)

### Plaintiff's Job History

Plaintiff was first hired by Verizon in 1989 as a directory
assistance operator but was terminated in September 1990 for
excessive absenteeism.  Ex. C to Kalish Aff. (March 9, 2004
Deposition of Plaintiff Wilfredo Perez) ("3/9/04 Perez Dep.") at
96, 156.  Plaintiff was rehired on February 14, 1995 as a
maintenance administrator.  Amended Complaint, Combined Case
Facts ¶ 2.  He worked in the SOCC[1] department until he was
transferred to the cable maintenance department in 1996.  Ex. E
to Kalish Aff. (December 3, 2004 Deposition of Plaintiff Wilfredo
Perez) ("12/3/04 Perez Dep.") at 75-77.  Plaintiff remained in
the cable maintenance department until 1999 when he was
transferred to the cable construction and maintenance department
("CXM") where he worked as a central office technician.  Id. at
78-79.  Plaintiff's responsibilities included testing phone lines
from Verizon's office and communicating with outside technicians
to troubleshoot the telephone system.  Id. at 70.

_____

[1] There is nothing in the record that defines the term
"SOCC."

2

## Plaintiff's Employment Record at Verizon

During plaintiff's employment at Verizon, the company administered a corrective, uniform, non-discriminatory attendance policy called the North Guidelines Attendance, New York ("Attendance Guidelines").  Affidavit of Betty-Lou DeVita ("DeVita Aff.") ¶ 4.  The stated purpose of the Attendance Guidelines is to "assist [a] supervisor in promoting good attendance."  DeVita Aff. Ex. A ¶ 2.0.  However, "for those employees . . . with poor attendance, the guide suggests steps which will detect at an early date the beginning of poor attendance habits and suggests methods of determining the underlying reasons for an individual's absence pattern."  Id.

In order to accomplish its goal of correcting a developing pattern of poor attendance, the Attendance Guidelines describe a six-step process whereby supervisors inquire into any unexcused absences and counsel the employee accordingly.  The first time an employee is absent from work, other than for a Family Medical Leave Act ("FMLA") covered reason, he or she will be placed in Step 1, "Absence Inquiry," where the supervisor contacts the employee to find out why the employee was absent and counsels the employee.  DeVita Aff. ¶ 6.  If an unexcused absence occurs within three months of the employee being placed on Step 1, the employee will be placed on Step 2, "Investigation," where the

supervisor notes the reason given by the employee for his or her absence and may take action if the reasons given by the employee are not health-related. Id. If the employee is absent within three months of being placed on Step 2 then he or she is placed on Step 3, "First Discussion," where the supervisor is required to review Verizon's attendance policy with the employee and inform the employee that repeated absences may result in termination. Id. ¶ 9. If the employee is placed on Step 4, "Second Discussion," the supervisor is required to review the employee's record with a higher-ranking supervisor and advise the employee that his or her job is in jeopardy as a result of the employee's poor attendance record. Id. ¶ 10. At Step 5, "Final Warning," the supervisor informs the employee that he or she will be terminated unless his or her attendance record becomes and remains satisfactory. Id. ¶ 11. The sixth, and final, step under the Attendance Guidelines is "Separation from Payroll," where the employee is terminated. Id. ¶ 12.

Plaintiff went through all six steps before his termination on February 3, 2001 for excessive absenteeism. Id. ¶¶ 13-33. Plaintiff first violated the attendance policy when he was absent for one month between August 25 and September 25, 1998. Id. ¶ 13. As a result, he was placed on Step 1 as outlined in the attendance guidelines. Plaintiff was subsequently absent a number of days, including one absence which spanned two months.

Id. ¶¶ 14-18.  No action was taken against plaintiff as a result of these absences.  Id.  The last of these absences occurred on March 25, 1999 when Jack Barnhill, plaintiff's supervisor, and Lizette Lizardi (not otherwise identified) discussed plaintiff's attendance record with him and mentioned that he should have already gone through Steps 2 and 3 and, therefore, should actually be placed on step 4, but they took no action at that time.  Id. ¶ 18.  Plaintiff was finally placed on Step 2 as a result of his absence from April 26 through April 30, 1999.  Id. ¶ 19.  He remained on Step 2 for six months.  Id.  Plaintiff was placed on Step 3 on July 30, 1999 as a result of his absence from June 25 through July 1, 1999.  Id.  ¶ 20.  Plaintiff was again absent from July 19 through July 26, 1999, but no action was taken as a result of this absence.  Id.  ¶ 21.

On August 9, 1999 plaintiff was placed on Step 4 for six months as a result of his absence from August 2 through August 6, 1999.  Id. ¶ 22.  Almost immediately after being placed on Step 4, plaintiff was again absent from August 16 through August 26, 1999 and on September 2, 1999.  Id. ¶¶ 23-24.  On December 28, 1999 plaintiff was placed on Step 5 as a result of his absence on December 17, 1999.  Id. ¶ 25.  Joseph Messina, his supervisor, in the presence of Betty-Lou DeVita, a manager, along with plaintiff's union representative read the following statement to plaintiff: "Your attendance is still unsatisfactory.  I am now

giving you Final Warning that unless your attendance becomes satisfactory to the Company [and] remains satisfactory, you will be separated from the payroll." Id. ¶ 25. Plaintiff responded that he understood the statement read to him. Id.

Between that meeting and June 18, 2000, plaintiff's attendance record improved and he was, therefore, retrogressed to Step 4. Id. ¶ 26. However, plaintiff's attendance record again deteriorated when he was absent on three further occasions including: (1) September 22 through October 22, 2000; (2) October 27 through November 2, 2000 and (3) November 9 through November 29, 2000. Plaintiff was once again placed on Step 5 on December 1, 2000. Id. ¶¶ 27-29.

Plaintiff's final absence occurred on January 25, 2001, at which time Verizon suspended plaintiff for ten days. Id. ¶¶ 32-33. DeVita and Messina recommended to Messina's supervisor, Guy Sorrentino, that plaintiff's employment be terminated. Id. ¶ 33. After confirming with the company's human resources and labor department that plaintiff was being treated consistently with Verizon's other employees, Sorrentino decided to discharge plaintiff. Id.

Plaintiff admits that he was fired for his excessive absenteeism. 3/9/04 Perez Dep. at 156. He blames his absences on the "onslaught of what [he] felt was offensive situations . . . [and his] trouble at home, with no heat, water, gas." Id.

## Allegations of Harassment

Plaintiff alleges that he was repeatedly harassed by management during his time at Verizon.[2]  For example, plaintiff's direct supervisor, Terry Mack, threatened plaintiff with physical harm on two separate occasions.  First, when plaintiff was re-hired in 1995, Mack addressed plaintiff along with fourteen other maintenance administrators, and threatened them with physical harm saying that, "[i]f any one of you are out of line, I have friends on the outside that will do harm to you, break – whatever."  Id. at 184-189.  Second, Mack yelled at plaintiff and threatened to kick plaintiff when plaintiff asked Mack if he could forward an irate caller to him.  Id. at 196-197.  In addition, when plaintiff first introduced himself to Mack, Mack told plaintiff that he hated the name Freddie, which is the name that plaintiff was known by.  Id. at 197.

Plaintiff also alleges that Jack Barnhill treated him differently from other employees and otherwise harassed him. Plaintiff specifically points to the fact that Barnhill did not allow plaintiff to play his radio, even though other employees were permitted to.  Id. at 213-214.  Barnhill also refused to

---

[2] The managers that plaintiff alleges harassed him include: (1) Tom Yacoppino; (2) Cliff Jones; (3) Steve Diaczuk;(4) Jack Barnhill; (5) J.J. Finn; (6) Tony Amendolia; (7) Tom Wade; (8) Terry Mack; (9) Betty-Lou DeVita; (10) Joanne Avona and (11) Tony Hinkson.

grant plaintiff's religious accommodation request not to work on
Saturdays.  Id. at 225.  In addition, Barnhill refused to pay
plaintiff holiday time for working on the Martin Luther King
holiday in 1996.  Ex. D to Kalish Aff. (June 21, 2004 Deposition
of Plaintiff Wilfredo Perez) ("6/21/04 Perez Dep.") at 401.
Barnhill, plaintiff claims, also denied plaintiff work-related
training, saying that he was not qualified enough for it, while
others were given permission to do so.  Id. at 403.  Further,
plaintiff claims Barnhill constantly yelled and cursed at him.
Id.  After Barnhill discovered plaintiff doing artwork on his
computer, Barnhill threatened to fire plaintiff if Barnhill
caught plaintiff again.  Id.  Plaintiff alleges that other
employees played video games installed on their computers but
were not similarly treated.  Id.

Plaintiff claims that Cliff Jones, another supervisor,
harassed him, and, as a result, plaintiff was suspended for ten
days in August 1997.  Plaintiff alleges that the harassment began
when Jones asked plaintiff to work overtime on a Thursday, and
plaintiff declined.  Id. at 304-305.  The next day, Betty Taylor,
a co-worker, announced that everyone was required to work
overtime on Saturday for a twelve hour shift.  Id. at 305.
Plaintiff, therefore, came in to work, for what he thought was
mandatory overtime.  Id.  That day plaintiff told Taylor that he
had heard from another co-worker that the Saturday overtime was

not mandatory.  Id. at 307.  Taylor abruptly jumped out of her seat and told plaintiff to "shut the f*** up" and "leave me the f*** alone."  Id. at 307.  Plaintiff began asking Taylor why she was cursing at him when Jones approached plaintiff and asked him why he was at work, since he had asked plaintiff on Thursday if he would work on Saturday and plaintiff declined.  Id. at 307.  Plaintiff explained to Jones that he was at work to do his mandatory twelve hours of overtime and that Jones had asked him to stay late on Thursday and that Jones had not asked if he wanted to work overtime on Saturday.  Id. at 307-308.  Jones then screamed at plaintiff that he was a liar.  Id. at 308.  Plaintiff was shocked and said to Jones "how dare you call me a liar."  Id. at 310.  Jones then told plaintiff to leave the office.  Id.

Plaintiff later told Yacoppino that Jones and Taylor had yelled at him, and that he was thrown out of the office for no reason.  Id. at 313.  Yacoppino promised plaintiff that he would investigate the situation and have a meeting concerning it.  Id. On August 1, 1997, Yacoppino suspended plaintiff for ten days for violence in the work place and insubordination.  Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("CWA 56.1 Statement") ¶ 13.  Yacoppino claimed plaintiff was violent and was intimidating other employees in the office and, therefore, Yaccopino was only willing to reduce his suspension if plaintiff received counseling, to which plaintiff agreed.  6/21/04 Perez

Dep. at 472-473. Plaintiff was subsequently suspended twice more for incidents including yelling at a manager, not working and taking more time than permitted on a break. See id. at 329. Plaintiff claims that all of these suspensions were based on false accusations. Id. at 318

Upon returning from one of these suspensions, plaintiff was moved into the CXM department. Id. at 430. Plaintiff testified that since he did not know what his responsibilities were at his new position, he did not do any work his first day back and simply sat and waited for instructions. Id. at 431. Eventually, J.J. Finn, a supervisor, approached plaintiff and told plaintiff that he would take him to Finn's office to welcome him to the department. Id. Instead, Finn took plaintiff to the street and yelled at him while plaintiff was up against a wall. Id. at 431-432. Finn told plaintiff that he was a "shitty employee," and that the job function in the CXM department was identical to cable maintenance and plaintiff should know how to do the work. Id. He also told plaintiff not to speak when Finn was speaking. Id. In an unrelated incident, Finn sent plaintiff home without pay for wearing shorts to work. Id. at 395.

According to plaintiff, Betty-Lou DeVita, another supervisor, would also yell at and harass him on a constant basis. Id. at 340. For example, she rudely asked plaintiff to correct errors in a job created by someone else, and to take the

blame for it. Id. at 341. She also yelled at plaintiff for taking too many breaks. Id. DeVita also told plaintiff not to speak Spanish in the workplace. Id. at 336-337. Finally, Devita met with plaintiff's female co-workers prior to plaintiff being transferred to the CXM department, and allegedly told them that plaintiff is violent, causing them to fear him. Id. at 323.

Plaintiff was also allegedly harassed by his co-workers.[3] Plaintiff claims that certain of his African-American co-workers yelled insults at him with no provocation. In particular, Gloria Halloway, an African American co-worker, told him "I hate Jews" and held a loud conversation questioning "why [plaintiff] should [] be allowed to observe the Sabbath." Id. at 226. In addition, when plaintiff worked for the cable maintenance department, his co-worker Phyllis Howard told plaintiff that his food smelled and then sprayed Lysol on it. 6/21/04 Perez Dep. at 443.

**(4)**

**Religious Accommodations**

Plaintiff claims that although he was raised Catholic, he realized at the age of sixteen that he wanted to be Jewish. 3/9/04 Perez Dep. at 109. Plaintiff made two requests, one to Barbara Lyons and one to Barnhill in 1995, to have Saturdays off to observe and celebrate the Sabbath, which is part of the Jewish

---

[3] These co-worker included: (1) Eterine Fortune; (2) Gloria Halloway; (3) Phyllis Howard; (4) Faye Wright; (5) Betty Taylor and (6) two individuals named Mary and Kathy.

faith. 3/9/04 Perez Dep. at 227. Both of plaintiff's requests

were denied. Id. at 228. Plaintiff made a final request to have

Saturdays off in February 2000, and this request was granted by

DeVita. DeVita Aff. ¶ 34. Plaintiff, however, claims that

Verizon's failure to accommodate his religious needs in 1995 was

unlawful.

### (5)

### The Union

During plaintiff's employment with Verizon, Communications

Workers of America[4] ("CWA") and Verizon were parties to a

collective bargaining agreement covering maintenance

administrators and central office technicians. Id. ¶ 4. Local

1109, of which plaintiff was a member during his employment, is

one of the CWA chartered locals covered by the agreement between

the CWA and Verizon. Id. ¶¶ 5, 12. The collective bargaining

agreement includes a three-step grievance procedure with Local

1109 processing grievances only through the first two steps of

the process. Id. ¶¶ 6-7. If the grievance is not resolved at

the first two steps, and the Local wants to pursue the matter

further, the collective bargaining agreement allows the Local to

appeal the grievance to the CWA. Id. ¶ 8. If the grievance is

---

[4] The CWA is an international union with chartered locals.
CWA's 56.1 Statement ¶ 1. The CWA defendant, Local 1109 is a
chartered local of the CWA and is a separate entity with its own
offices and budget. Id. ¶ 3.

still not resolved at the third step, the CWA then has the option of seeking arbitration.  Id. ¶¶ 8-9.

Over the course of plaintiff's tenure at Verizon, he was suspended three times.  Each time, Local 1109 grieved his suspensions to the fullest extent allowed under the collective bargaining agreement.  Plaintiff's first suspension was reduced and removed from his file as a result of the Union's efforts. Memorandum of Law in Support of Motion for Summary Judgment of Defendant CWA, Local 1109 ("CWA Motion") at 3; Leath Decl. ¶ 10. The second suspension was found to be fair and just.  See Leath Decl. Ex. C. (October 9, 1998 CWA Grievance Denial Letter).  The grievance for the third suspension was withdrawn after the Union researched it.  Leath Decl. ¶ 12.

Plaintiff, who received three warnings from his employer, refused to have Local 1109 grieve these warnings, and even wrote a letter stating that he considered Local 1109's attempt to grieve the warning as unwanted representation since he never requested it.[5]  Id.

Local 1109 grieved plaintiff's February 2001 discharge and pursued it through the first two steps, and the grievance was denied.  CWA's 56.1 Statement ¶¶ 30-31.  Local 1109, through the

_____

[5] Local 1109 has a policy of keeping the grievant informed at each step of the grievance process, where the grievant is both told of any grievance meeting and given the option to attend these meetings. Leath Decl. ¶ 8.

CWA, appealed the grievance to the third step, which was also denied.  Id. ¶ 32.  After reviewing plaintiff's absence history, the CWA decided not to take the grievance to arbitration.  Id. ¶ 33.  By letter dated July 8, 2001, Local 1109 informed plaintiff that the CWA planned no further action.  Id.

## Plaintiff's Complaints

On October 7, 1991 plaintiff filed a complaint with the NYCCHR alleging that he was denied a promotion and was subsequently terminated because of his color and national origin.[6]  Company's Memorandum at 4.  On May 19, 1993 the NYCCHR dismissed plaintiff's complaint on the grounds that it was time barred.  Id.

On March 26, 1998 plaintiff filed another complaint with the NYCCHR against Verizon alleging that respondents Terry Mack, Cliff Jones, Jack Barnhill and Betty Taylor discriminated against him by denying him equal terms and conditions of employment because of his national origin, religion and in retaliation for

--------

[6] The complaint included allegations that (1) plaintiff's supervisor told him that it would be impossible for plaintiff to ever become a supervisor; (2) plaintiff saw a bulletin board posted at Verizon's office which specified twenty-seven positions available for whites and only two positions available for Hispanics; (3) plaintiff was reprimanded for speaking with a customer who did not speak English and (4) plaintiff's white co-worker was offered a supervisor position, even though plaintiff's productivity was superior to his co-worker's.  NYCCHR Verified Complaint Against Verizon ("NYCCHR Verizon Complaint") ¶¶ 6-13.

opposing discrimination.  Id.

On August 24, 1998, plaintiff filed another complaint with
the NYCCHR, this time against Local 1109.  Leath Decl. ¶ 14.
Plaintiff alleged that the Union subjected him to disparate
treatment including: (1) denying him essential training;
(2) failing to take appropriate remedial action in response to
his reports of having been denied reasonable religious
accommodations and (3) denying him representation to which he was
entitled to at least three grievances.  Perez Verified Complaint
Against CWA Local 1109 ("NYCCHR CWA Complaint") ¶ 4.  As a
result, plaintiff claimed that he was discriminated against by
Local 1109 by being denied equal terms and conditions of union
membership as a result of his national origin and creed in
violation of Title VII of the Civil Rights Act of 1964.  Id.
¶¶ 5-6.

On November 12, 2001, plaintiff amended the NYCCHR complaint
against Verizon to include Steve Diaczuk and Joanne Avona as
respondents.  Id.  On February 24, 2003 the NYCCHR dismissed
plaintiff's complaint against Verizon because plaintiff
interfered with their investigation by: (1) making phone calls at
all hours of the night, including leaving five messages in
English and Spanish at 4:30 a.m. and (2) writing a threatening
letter where plaintiff stated "I wish I could see the curse come
upon you and all other false, seven times over injustices you

15

have place [sic] on us, the innocent. You worst [sic] than

terrorist." Kalish Aff. ¶ 13 Ex. K. (February 13, 2003 Notice of

Administrative Closure) ("2/13/03 Notice of Administrative

Closure"). On April 25, 2003 the Equal Employment Opportunity

Commission ("EEOC") adopted the NYCCHR's findings, and issued a

"right to sue" letter, giving plaintiff ninety days to bring suit

against Verizon. <u>See</u> EEOC Dismissal and Notice of Rights.

Similarly, on March 7, 2003 the NYCCHR administratively

closed plaintiff's complaint against Local 1109 because plaintiff

repeatedly engaged in conduct which was disruptive to the orderly

functioning of the NYCCHR. Leath Aff. ¶ 14 Ex. L. (March 7, 2003

Notice of Administrative Closure) ("3/7/03 Notice of

Administrative Closure").


## Discussion

Summary Judgment is appropriate when there is "no genuine

issue as to any material fact and . . . the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is inappropriate where: (1) the evidence

presents a factual dispute that a reasonable jury could decide in

favor of the nonmoving party and (2) the facts in dispute will

have a material affect on the outcome of the case. <u>See</u> <u>Anderson</u>

<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). All inferences

must be drawn from the underlying facts in a "light most

favorable to the party opposing the motion." <u>United States v.</u>
<u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).  Nevertheless, the party
opposing summary judgment must put forth "specific facts showing
that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).
In cases such as the one at bar, bare allegations of
discrimination "devoid of specifics, but replete with
conclusions" are not enough.  <u>Bickerstaff v. Vasser Coll.</u>, 196
F.3d 435, 451 (2d Cir. 1999); <u>see also</u> <u>Meiri v. Dacon</u>, 759 F.2d
989, 998 (2d Cir. 1985).  The Second Circuit has pointed out that
"an extra measure of caution" is required in deciding whether to
grant summary judgment in employment discrimination cases because
evidence of discriminatory intent is rare.  <u>Dugan v. CBS</u>
<u>Broadcasting, Inc.</u>, No. 00 Civ. 8908(GWG), 2002 WL 338142 at *4
(S.D.N.Y. March 4, 2002) (citing <u>Holtz v. Rockefeller & Co.</u>, 258
F.3d 62, 69 (2d Cir. 2001)).  However, at the same time, granting
summary judgment is still proper, and even necessary, in Title
VII claims lacking genuine issues of material fact.  <u>Id.</u>

(1)

**Title VII Claims**

Title VII of the Civil Rights Act of 1964 provides, in
relevant part, that "[i]t shall be an unlawful employment
practice for an employer . . . to discriminate against any
individual with respect to his compensation, terms, condition, or
privileges of employment, because of such individual's race,

17

color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). Plaintiff's employment discrimination claims are governed by the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. In order to successfully bring a claim under Title VII, a plaintiff must first establish a prima facie case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). If the plaintiff can meet this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision in question. Id. at 506-07. If the defendant is able to do so, the presumption of discrimination "completely drops out." James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). The court must then examine the complete record to determine if the plaintiff can satisfy his ultimate burden of proving that the adverse employment action was discriminatory and that the reason proffered by the defendant is pre-textual. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

## (2)

### Exhaustion of Administrative Remedies

Both defendants argue that plaintiff's claims should be barred because plaintiff has failed to exhaust his administrative remedies by purposely preventing the NYCCHR from reaching the merits of his charges. The filing of an administrative complaint

18

is a jurisdictional pre-requisite to a Title VII action.  Barnes
v. Levitt, 118 F.3d 404, 408 (5th Cir. 1997) (citing Dollis v.
Rubin, 77 F.3d 777, 781 (5th Cir. 1995)).  Further, a complainant
must pursue and exhaust his administrative remedies prior to
filing a judicial complaint.  Id. (citing Johnson v. Bergland,
614 F.2d 415, 417 (5th Cir. 1980)).  It is well-established that
a plaintiff who resorts to the administrative process but does
not cooperate in the proceedings can thereby fail to exhaust his
administrative remedies.  Id.  "The test for cooperation in the
administrative process is a common one, geared to the functional
demands of dispute resolution."  Id.  This requires a good faith
effort by the employee to cooperate with the agency and the EEOC
in order to exhaust the administrative remedies.  Id.

Plaintiff's complaints filed with the NYCCHR against both
Verizon and the Union were closed because of plaintiff's
"unwarranted conduct."  See 3/7/03 Notice of Administrative
Closure.  Plaintiff first slowed the investigation by referring
unrelated claims that he made with other agencies[7] to the NYCCHR,
forcing the NYCCHR to write a number of letters detailing
plaintiff's claims.  In addition, plaintiff, on several
occasions, expressed frustration and distrust of the Commission

_____

[7] Among these were the Federal Emergency Management Agency
("FEMA") and the New York State Office of Temporary Disability
Assistance ("NYSTDA"), where plaintiff made references to the
complaints he filed with the NYCCHR.

in accusatory and threatening terms by telephone, letters and through email. Id. As a result, the NYCCHR decided that "[t]he accumulation of these actions . . . disrupted the orderly functioning of the Commission," and dismissed plaintiff's complaint without even looking at its merits. Id.

It has been held that "[i]f the agency does not reach the merits of the complaint because the complainant fails to comply with the administrative procedures the court should not reach the merits either." See Johnson, 614 F.2d at 418 (finding that plaintiff's suit was properly dismissed for his failure to exhaust his administrative remedies because he did not comply with the agency request for more specific information, and, therefore, prevented the agency from ruling on the merits of the complaint); Barnes, 118 F.3d at 409 (finding that plaintiff failed to exhaust her administrative remedies when she did not make reasonable efforts to provide necessary relevant information to the Securities and Exchange Commission, causing it to cancel her complaint instead of ruling on the merits).

Because of plaintiff's interference with the NYCCHR's investigation, the Commission was unable to reach the merits of plaintiff's complaints against either Verizon or the Union. Therefore, the NYCCHR's closing of plaintiff's complaints is by no means an exhaustion of plaintiff's remedies as plaintiff forced the NYCCHR to abandon its investigation. "The

administrative complaint procedures must be complied with.  If
they are, and an adverse decision is rendered on the merits of
the complaint, then a complainant is entitled to a de novo
hearing in federal court." Johnson, 614 F.2d at 418.

Even if the NYCCHR had been able to complete its
investigation, certain of plaintiff's claims are barred because
they are either untimely, fail on the merits or because plaintiff
failed to allege them in his EEOC charge, and thus failed to
exhaust his administrative remedies as to these claims, a
prerequisite to bringing a Title VII claim in federal court.
Butts v. City of New York Dep't. of Housing Preservation and
Dev., 990 F.2d 1397, 1403 (2d Cir. 1998).  A district court
generally has no jurisdiction to hear claims not alleged in an
employee's EEOC charge.  See Brown v. Coach Stores Inc., 163 F.3d
706, 712 (2nd Cir. 1998).  The purpose of the administrative
exhaustion requirement is "to give the administrative agency the
opportunity to investigate, mediate, and take remedial action."
Id. (quoting Stewart v. United States Immigration &
Naturalization Services, 762 F.2d 193, 198 (2d Cir. 1985)).
However, an exception is that claims which are "reasonably
related" to the EEOC charge may be brought in a subsequent
federal court action.  See Butts, 990 F.2d at 1402.

Although every single alleged discriminatory incident may
not have been mentioned in plaintiff's EEOC charge against

Verizon and the Union, they are all "reasonably related" to plaintiff's general allegations of retaliation, harassment, and discriminatory discharge. The EEOC, therefore, in investigating the complaint, would have assessed plaintiff's treatment by managers, co-workers and union members in order to deduce whether plaintiff's complaints of discrimination generally had merit, and not just focus on the specific complaints plaintiff made in his EEOC charge. See Brown, 163 F.3d at 712. However, plaintiff completely fails to mention anything in his EEOC charge concerning his religious accommodation claim against Verizon, and, therefore, this claim is barred.[8]

## (3)

### Untimely Allegations

The timely filing of a charge with the EEOC is a prerequisite to the maintenance of a Title VII action. Francis

---

[8] Even after examining the merits of plaintiff's religious accommodation claim it is clear that this claim should be dismissed. In order to establish a prima facie case of religious discrimination plaintiff would have to demonstrate that: (1) he has a bona fide religious belief or practice that conflicts with an employment requirement; (2) he informed the employer of his belief or practice and (3) he was disciplined for failing to comply with the conflicting employment requirement. Gay v. S.U.N.Y. Health Science Center of Brooklyn, Civ. No. 96-CV-5065(JG), 1998 WL 765190 at *5 (E.D.N.Y. July 22, 1998) (citing Sable v. Stickney, 91 Civ. 8038, 1993 WL 267337 at *7-8) (S.D.N.Y. July 13, 1993) (citing Philbrook v. Ansonia Board of Education, 757 F.2d 476, 481 (2d Cir. 1985)). Assuming that plaintiff has a legitimate belief in Judaism, plaintiff still presents no facts that his employment at Verizon required him to work on Saturdays, and he never alleges that he was disciplined for failing to work on a Saturday.

<u>v. Chemical Banking Corp.</u>, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999). In New York, where a state agency exists to investigate charges of employment discrimination, a charge of discrimination under Title VII must be filed with the EEOC within 300 days of the alleged unlawful employment action. <u>Id.</u> at 959. This requirement functions as a statute of limitations in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court. <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 765 (2nd Cir. 1998).

Because plaintiff's charge to the NYCCHR against Verizon is dated March 26, 1998, any incidents occurring before May 28, 1997 are time-barred. Therefore: (1) plaintiff's claim concerning the denial of his holiday pay for Martin Luther King Day which occurred in 1996;[9] (2) plaintiff's claim of being denied additional pay for training employees while working in the SOCC department, which must have occurred before 1996 when he was transferred to another department and (3) plaintiff's claims concerning harassment by his former manager Mack, which occurred when he was first re-hired in 1995, are all time-barred and will

---

[9] Verizon claims that Martin Luther King Day was designated as a floating holiday, which employees have the option of taking off, but would not receive holiday compensation if they chose not to. In addition, plaintiff cannot specifically identify any similarly situated employees who received such pay for working on Martin Luther King Day. Therefore, this claim would have been dismissed even if it were not time-barred.

not be discussed further. Plaintiff's charge to the NYCCHR against the Union was made on August 24, 1998, therefore, the 300 day look-back period stops at October 28, 1997. Plaintiff made two requests for religious accommodations in 1995, more than two years before the look-back period. Therefore, plaintiff is also barred from bringing his claim of religious accommodation against the Union.[10]

### (4)

### Discriminatory Discharge

Plaintiff alleges that he was discharged in violation of Title VII. In order to establish a prima facie case of discriminatory discharge, a plaintiff must show that: (1) he belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he was discharged and (4) his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). The burden on plaintiff at this stage is de minimis. Id. In order to satisfy the second element of his prima facie case, plaintiff "need not show perfect performance or even average performance." James v. Runyon, 843 F. Supp. 816, 822 (N.D.N.Y. 1994) (citing Powell v. Syracuse University, 580 F.2d 1150, 1155 (2d Cir.

---

[10] Although plaintiff is time-barred from bringing a claim of religious accommodation against Verizon, this claim is also dismissed on exhaustion grounds, as discussed supra.

1978)) (other internal citations omitted). Plaintiff only needs to show that his performance was of "sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge [him]." Runyon, 843 F. Supp. at 822 (citing Powell, 580 F.2d at 1155).

It is undisputed that plaintiff, as a Puerto Rican, is a member of a protected class, and was discharged, satisfying the first and third elements of his prima facie case. However, plaintiff is unable to show that he performed his job satisfactorily. As discussed supra, plaintiff had a very large number of unexcused absences. All the reprimands, warnings and counseling that plaintiff received as a result of his excessive absenteeism is evidence that Verizon considered regular attendance to be an important criterion for job performance. In addition, "[e]xcessive absenteeism has been repeatedly cited by courts as evidence of lack of satisfactory job performance." Hendrics v. National Cleaning Contractors, Inc., No. 95 Civ. 5240(CSH), 1998 WL 26188 at *3 (S.D.N.Y. Jan. 26, 1998). Furthermore, plaintiff fails to bring even a hint of support in favor of his argument that his termination was a result of discrimination. For example, nowhere in plaintiff's complaint does he claim that other employees with a similar attendance record were treated differently. Because plaintiff has failed to meet his de minimis burden, both defendants' motions for summary

judgment must be granted on plaintiff's discriminatory discharge claim.

(5)

**Hostile Work Environment**

The language of Title VII "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. Harris v. Forklift Systems, Inc., 510 U.S. 20, 21 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986))(quoting Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 707 (1978)).

To establish a prima facie case of a racially hostile work environment a plaintiff must show that: (1) he or she was subjected to harassment because of his or her membership in a protected class to the point that the conditions of his or her employment were changed and (2) there is a specific basis of imputing the harassment to the defendant. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998). The test for the first prong is whether the employment environment was "objectively hostile," meaning whether the environment "was permeated with discriminatory intimidation, ridicule and insult

26

that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Little v. National Broadcasting Company, 210 F. Supp. 2d 330, 388 (S.D.N.Y. 2002) (quoting O'Dell v. Trans World Enter. Corp., 153 F. Supp. 2d 378, 385 (S.D.N.Y. 2001)).

The Supreme Court in Harris v. Forklift Systems, Inc. held that in determining whether a workplace is objectively hostile, a court should look at the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." Id. at 21. Therefore, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." Little, 210 F. Supp. 2d at 389 (quoting Quinn, 159 F.3d at 768).

Plaintiff claims that throughout his employment at Verizon he was harassed by several different managers and co-workers. However, plaintiff's allegations, even when examined

collectively, "do no paint the portrait of a hostile workplace environment that rises to the legal standard articulated." Ellenbogen v. Projection Video Services, Inc., No. 99 Civ. 11046(NRB), 2001 WL 736774 at *10 (S.D.N.Y. June 29, 2001).

Plaintiff alleges that:[11] (1) he was constantly being yelled at by managers and co-workers for no apparent reason; (2) he was scolded and physically intimidated once by J.J. Finn who called him a "shitty employee"; (3) Union and Verizon representatives told him that he could not speak Spanish at work (4) he was physically attacked by a Union representative; (5) he was denied the right to attend union meetings and (6) he was not allowed to participate in job-related training courses.

With regard to plaintiffs claims of verbal and physical abuse, such actions, as deplorable as they may be, do not constitute "discriminatory intimidation" as required for a proper Title VII claim unless they are racially motivated. There are no facts, however, that support plaintiff's assertion that Finn's actions were motivated by plaintiff's race. Plaintiff's deposition points to facts suggesting that Finn's actions were strongly motivated by anger at plaintiff for failing to understand how to do his job rather than animus toward plaintiff as a result of his "Puerto Rican" race.

---

[11] The claims that plaintiff makes against his former employer and his union are largely the same and, therefore, will be examined at the same time.

Similarly, plaintiff fails to bring forth any facts that link the verbal abuse that he was subjected to by his managers and co-workers, or the attack that he suffered at the hands of the Union representative, to his race. Plaintiff does not allege, for example, that he was called a derogatory term for a person of his race, which would likely be evidence of the racial motivations behind the numerous scoldings plaintiff received. Instead plaintiff generally states that the fact that he was the only "Brown skinned Spanish speaking Puerto Rican Jew" in his department is evidence that anything that he found offensive was motivated by his race, creed and religion and violates Title VII. See e.g. Amended Complaint ¶¶ 6, 15. Plaintiff's allegations, completely fail to draw a connection between the harassment plaintiff alleges to have suffered and his race.

Similarly, plaintiff has produced no evidence from which to infer that his being denied the right to attend union meetings or participate in job-related training courses, was based on his race. For example, "proof that similarly situated Caucasian employees received different treatment would raise such an inference" of discrimination. Little, 210 F. Supp. 2d at 377. However, plaintiff is unable to bring forth facts that might prove that other similarly situated employees were treated more favorably. For example, plaintiff cannot name any specific employees who were similarly situated to himself who were allowed

to participate in job-related training courses when he was not. In addition, plaintiff admits that he was never told that he could not attend union meetings, but claims he was not allowed to leave his desk without permission and therefore was unable to attend the meetings. However, plaintiff never asked permission to leave his seat to attend these meetings and, in any case, the meetings took place outside of work hours. As a result, even if plaintiff suffered these adverse employment actions, he is unable to link them to animus towards his race, national origin, creed or religion.

Plaintiff also claims that he had to ask permission to leave his desk, his supervisor would not allow him to re-locate during reconstruction of his department, he was sent home for wearing shorts to work, he was not allowed to set up another company cell phone account, he did not have his own locker, he was stripped of passwords and he was not allowed to play video games or do artwork while on the job. This court dismisses these allegations because they do not cause a "materially adverse change" in the terms and conditions of plaintiff's employment and therefore are not adverse employment actions. See Little, 210 F. Supp. 2d at 377 (finding that the stringent treatment that the employee complained of - not being permitted to arrive late, to prop his feet up, or to read books or do bills during work - does not rise to the level of an adverse employment action that "materially

affects" the conditions of his employment).

He also claims that he was prohibited from speaking Spanish with his co-workers and a customer, but does not give any details; nor does he claim that it was Verizon's policy rather than the act of a single supervisor. With respect to the customer, plaintiff references a single incident in May 1989 when an unidentified person "reprimanded [him] for speaking with hispanic customer who did not speak English." NYCCHR Verizon Complaint ¶ 10. This incident is clearly time-barred, as discussed supra, but, regardless, plaintiff's claim is not specific enough to impute liability. Moreover, it would not make sense for Verizon, which serves a large Spanish-speaking population and employs a number of Spanish-speaking persons, to essentially refuse to service those customers. Similarly, with respect to his co-workers, plaintiff could only remember one incident and did not indicate that it was a regular practice of his supervisors.

The only alleged incidents of harassment that have the potential of being attributed to racial or religious animus are: (1) plaintiff being told by Halloway "I hate Jews"; (2) the posting of an article about the lack of Spanish-speaking operators in the New York City 911 department on plaintiff's desk, with hand-written words on it that read "learn to speak English"; (3) a Union representative telling plaintiff that since

he was "Black and Hispanic" and at the bottom of the totem poll,
that made him not qualified for receiving training and
(4) plaintiff having Lysol sprayed on his food by Howard because
she believed that it had a bad smell.[12]  A reasonable jury could
not conclude that any of these incidents was extraordinarily
severe or that all four isolated incidents committed by at least
three different employees and/or Union representatives on four
separate occasions were "sufficiently continuous and concerted to
have altered the conditions of [plaintiff's] working
environment."  <u>Citroner v. Progressive Cas. Ins. Co.</u>, 208 F.
Supp. 2d 328, 340 (E.D.N.Y. 2002) (finding no hostile work
environment claim where the plaintiff's team leader (1) mocked
the Spanish language; (2) left a Speedy Gonzalez doll on the
plaintiff's desk and called him Speedy Gonzalez and (3) told
plaintiff more than once to act more white and lose his cocky
Spanish attitude, because the harassment lasted for only one day
during training and less than a month after the plaintiff's
tormentor became team leader); <u>see</u> <u>Abouzied v. Mann</u>, No. 97-CV-
7613(FB)(CLP), 2000 WL 1276635 at *5 (E.D.N.Y. Aug. 30, 2000)
(finding no <u>prima</u> <u>facie</u> case of national origin hostile work
place condition where the plaintiff alleged that his supervisor
yelled at him, unfairly reprimanded him and gave him more

---

[12] A liberal understanding of this incident may indicate
animus because plaintiff's food may have been a dish linked to
his race or national origin.

32

difficult assignments as a result of his nationality).

Even assuming, however, that plaintiff is able to make out a
prima facie case of a hostile work environment, based on
plaintiff's attendance record, Verizon had a legitimate reason to
terminate plaintiff's employment, which plaintiff does not
dispute.  In addition, just as plaintiff cannot show
discriminatory motivation behind his firing, he can show no pre-
text for his dismissal.

Moreover, neither Verizon nor the Union may be found liable
for the actions of Verizon supervisors.  In Faragher v. City of
Boca Raton, 524 U.S. 775 (1988), and Burlington Industries, Inc.
v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that even
though an employer "is subject to vicarious liability to a
victimized employee for an actionable hostile work environment
created by a supervisor," in certain circumstances, "a defending
employer may raise an affirmative defense to liability or
damages."  Fierro v. Saks Fifth Ave., 13 F. Supp. 2d 481, 491
(S.D.N.Y. 1998) (quoting Faragher, 524 U.S. at 776).  This
affirmative defense comprises of two elements "(a) that the
employer exercised reasonable care to prevent and correct
promptly any sexually harassing behavior,[13] and (b) that the

_____

[13] Although Faragher speaks specifically to allegations of
sexual harassment, Fierro interprets this affirmative defense as
also being available to allegations of racial discrimination.
Fierro, 13 F. Supp. 2d at 491.

plaintiff employee unreasonably failed to take advantage of any
preventive or corrective opportunities provided by the employer
or to avoid harm otherwise." Faragher, 524 U.S. at 809. The
Supreme Court limited this affirmative defense and claimed that
it is not available "when the supervisor's harassment culminates
in a tangible employment action, such as discharge, demotion, or
undesirable reassignment." Fierro, 13 F. Supp. at 491 (quoting
Faragher, 524 U.S. at 776). This case does involve plaintiff's
ultimate discharge from Verizon, but the harassment did not lead
to plaintiff's termination. Instead, plaintiff was discharged
because of his excessive absenteeism, which plaintiff admits.
Therefore, the Faragher /Burlington affirmative defense is
available to Verizon with respect to plaintiff's hostile work
environment claim.

The Supreme Court explained that in determining whether an
employer has met the first element of the affirmative defense,
the employer's promulgation of an "anti-harassment policy with
complaint procedure," is an important, if not dispositive,
consideration. Id. It is undisputed that throughout plaintiff's
employment, Verizon maintained clearly stated policies against
discrimination and harassment, which were contained in its Code
of Business Conduct ("the Code") and provided a means by which an
employee could complain of alleged violations without fear of
retaliation. DeVita Aff. ¶ 37. Verizon also maintained an

Ethics and Corporate Compliance Guideline, which is a telephone
hotline that provided additional means by which employees could
complain about alleged discrimination and harassment.  _Id._  While
plaintiff was employed, the hotline was staffed twenty-four hours
a day, seven days a week.  _Id._  In addition, Verizon also posted
its equal employment and anti-harassment policies.  _Id._
Therefore, Verizon has met the first element of the affirmative
defense.

The second element of the affirmative defense inquires into
whether plaintiff unreasonably failed to take advantage of the
complaint procedure.  "If the victim could have avoided harm, no
liability should be found against the employer who had taken
reasonable care."  _Faragher_, 524 U.S. at 805.  Plaintiff has
admitted that he received the Code on three separate occasions,
and was aware of Verizon's complaint procedure, and yet he never
used the complaint procedure to report any of his allegations of
racially motivated harassment, nor did he complain to anyone in
his union that fellow union members harassed him.  "At some
point, employees must be required to accept responsibility for
alerting their employers to the possibility of harassment."
_Fierro_, 13 F. Supp. 2d at 492.  In addition, plaintiff's excuse
that he believed his NYCCHR complaint to be sufficient to notify
Verizon of the alleged harassment is not proper.  _See id._ ("To
allow an employee to circumvent the reasonable complaint

requirements of <u>Faragher</u> and <u>Burlington</u> . . . would effectively eviscerate an affirmative defense which the Supreme Court clearly went to great effort to craft in order to stem the tide of unwarranted lawsuits").

Plaintiff is unable to make out a <u>prima facie</u> case of a racially hostile work environment, and even if he were able to make out a <u>prima facie</u> case, neither of the defendants can be held liable for the wrongful actions of its managers and workers. As a result, the defendants are granted summary judgment on plaintiff's hostile work environment claim.

**(6)**

**Retaliation**

Title VII also forbids retaliation against an employee for complaining of prohibited employment discrimination, stating that, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a). Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause."  <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141 (2nd Cir. 2003) (quoting <u>Cosgrove v. Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1039 (2d Cir. 1993)).  To establish a <u>prima facie</u> case of retaliation a plaintiff must prove: (1) he was engaged in a

protected activity; (2) he suffered an adverse employment action and (3) an inference of a causal connection between the protected activity and the adverse employment action. <u>Van Zant v. KLM Royal Dutch</u>, 80 F.3d 708, 713 (2d Cir. 1996). A retaliation claim follows the burden shifting framework of a discrimination claim. <u>See</u> <u>Little</u>, 210 F. Supp. 2d at 384.

Plaintiff alleges against both defendants that "he was a victim of retaliation due to his having participated in a 1991 race discrimination complaint filed with the NYCCHR against [Verizon]." Amended Complaint ¶ 73. More specifically, plaintiff claims that management employees "had it out" for him as a result of him filing his 1991 charge, and the result was that he was constantly harassed, suspended and finally terminated in violation of Title VII. It is undisputed that plaintiff's 1991 complaint to the NYCCHR constituted a "protected activity," and that plaintiff has therefore demonstrated the first element of his <u>prima</u> <u>facie</u> case of retaliation. Plaintiff is also able to show that Verizon took adverse employment actions against him by proof of his numerous suspensions and eventual termination.

Plaintiff, however, is unable to establish a causal connection between the 1991 complaint and the adverse employment actions. To establish the requisite causal nexus between the "protected activity" and the "adverse employment action," a plaintiff must present evidence sufficient to raise the inference

that his protected activity was the likely reason for the adverse action. Runyon, 843 F. Supp. at 826 (citing Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982)).

It cannot be concluded that plaintiff's "protected action" was a "but for" cause of the adverse effects suffered by him. Plaintiff brings forth no proof that those who allegedly retaliated against him in 2001 were even aware of plaintiff's 1991 complaint. Plaintiff's adverse employment actions seem more closely linked to plaintiff: (1) doing artwork on his computer; (2) leaving on frequent and lengthy smoking breaks without permission; (3) wearing shorts to work; (4) playing his radio too loudly; (5) failing to do his job properly, or at all, and (6) failing to show up to work on numerous occasions. There is no evidence from which it can be inferred that plaintiff was scolded or terminated because of his 1991 complaint, but there are countless facts, admitted by plaintiff during his deposition, that indicate that plaintiff suffered these adverse employment actions because of his own inability to act appropriately as a Verizon employee.

In addition, the law indicates that a lengthy period between the protected activity and an adverse employment action suggests an absence of causation. Dugan, 2002 WL 338142 at *10; See e.g. Nicastro v. Runyon, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as

three months elapse between EEO activity and the alleged act of retaliation . . . [s]urely two-and-one-half years is far too long to warrant an inference of discrimination").  Because plaintiff's "protected activity" occurred in 1991, at least six years and as much as ten years before the alleged retaliatory actions, "no close proximity in time exists between [the protected acts and the adverse employment actions] and the discharge sufficient to establish a _prima_ _facie_ case of [retaliation]."  _Dugan_, 2002 WL 338142 at *10 (quoting _Sykes v. Mt. Sinai Med. Ctr._, 937 F. Supp. 270, 276 (S.D.N.Y. 1996)).  Therefore, because plaintiff is unable to make out a _prima_ _facie_ case, both defendants are entitled to summary judgment on plaintiff's claim of retaliation.

**(7)**

**Duty of Fair Representation Claim**

The gravamen of plaintiff's discrimination complaint against the Union is that Local 1109, being aware that plaintiff was being harassed and treated unequally, refused to properly investigate and represent plaintiff.  Amended Complaint, CWA Case Facts ¶ 37.  It is well established that a union may be subject to Title VII liability for breaching its duty of fair representation.  _Carrio v. Enterprise Assoc., Metal Trades Branch Local Union 638_, 227 F.3d 29, 33 (2d. Cir. 2000).  To successfully bring such a claim, a plaintiff must prove, by a preponderance of the evidence, that the union breached its duty,

39

and that the breach was caused by a discriminatory intent made unlawful by Title VII. <u>See</u> <u>Greenslade v. Chicago Sun-Times, Inc.</u>, 112 F.3d 866-67 (7th Cir. 1997); <u>Kozera v. International Broth. Of Elec. Workers, AFL-CIO</u>, 230 F. Supp. 2d 413, 421 (S.D.N.Y. 2002).

In order to establish a claim against his union, plaintiff must show that: (1) the union violated its duty to plaintiff; (2) the union permitted the breach to go unrepaired, thus breaching its own duty of fair representation and (3) there was some indication that the union's actions were motivated by racial animus. <u>Bugg v. International Union of Allied Industrial Workers of America</u>, 674 F.2d 595, 598 n. 5 (7th Cir. 1982). Although each case is highly fact-dependent, courts give unions significant leeway in deciding how to best represent their members. To establish conduct made in bad faith, a plaintiff must show substantial evidence of the union's "fraud, deceitful action or dishonest conduct." <u>Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees v. Lockridge</u>, 403 U.S. 274 (1971).

Plaintiff cannot prove the first two prongs of his claim against his union. Local 1109 went to great lengths in order to comply with the agreement concerning plaintiff. The union grieved: (1) three of plaintiff's suspensions; (2) several warnings that plaintiff received from his managers and (3) plaintiff's termination. It is apparent, therefore, that

plaintiff's union had indeed properly complied with the
collective bargaining agreement by processing grievances on
behalf of plaintiff through all three steps of the grievance
procedure in both a vigorous and timely manner.  As proof of its
hard work, the union successfully negotiated a settlement in
plaintiff's first suspension that included back pay for half of
plaintiff's suspension as well as the expungement of the mention
of insubordination from plaintiff's records.  Despite the union's
efforts, plaintiff displayed great animus towards Local 1109 in a
written letter where he stated that he considered the union's
attempt to grieve warnings he received as unwanted representation
because he did not request their involvement.  It seems odd that
plaintiff would show such ungratefulness towards his union by
requesting that it not interfere, and then complain that it did
not properly represent him.

In addition, plaintiff has failed to bring even a scintilla
of evidence concerning how he believes the union failed to
properly represent him.  Instead, he makes a general allegation
that the union failed to represent him, knowing that he was being
harassed and treated unequally as a result of his race, and that
they should have grieved his suspensions, which they in fact did
to the fullest extent possible.  Finally, even if plaintiff were
able to prove that the union failed to properly represent him,
aside from this general allegations, plaintiff has set forth no

facts to support the accusation that the improper representation was a result of his race, color or religion.  Although a plaintiff in Perez's situation is not entitled to error-free representation, <u>see</u> <u>Hines v. Anchor Motor Freight, Inc.</u>, 424 U.S. 554, 567 (1976), the advocacy he received from his former union appears to have been the best it could have been under the circumstances, and, therefore, it was certainly commensurate with the standards of fair representation required under Title VII.

## Conclusion

For the foregoing reasons, the defendants' motions for summary judgment are granted, and plaintiff's claims are dismissed with prejudice.  The Clerk of the court is directed to close the case.


Dated:      Brooklyn, New York
            September 6, 2005


                              SO ORDERED:

                                   /s/
                              _____

                              David G. Trager
                              United States District Judge